UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | Criminal No. 05-30056-MAP |
| ) | |
| vs. ) | BRIEF IN SUPPORT OF |
| ) | DEFENDANT'S MOTION |
| ASIF MAHMOOD, ) | TO SUPPRESS |
| Defendant ) | |

## STATEMENT OF FACTS

On April 19, 2005, Defendant was living at 748 Alden Street, Springfield, Massachusetts. At approximately 10:00 a.m., three Immigration and Customs Enforcement agents knocked on Defendant's door, which awoke Defendant, who was asleep following his late shift at work from 5:00 p.m. to 5:00 a.m. After the Defendant opened his door, the three agents immediately entered without identifying themselves, and one of the agents conducted a protective sweep of the adjoining rooms. Upon the agent's return, the three agents identified themselves and told the Defendant that they wanted to talk to him regarding his marriage. They informed him that his failure to talk to them was a felony and that he faced arrest if he failed to do so. The questioning took approximately three hours, and the Defendant, on several occasions, requested that the agents speak slower, repeat questions, and rephrase questions. Defendant, who is Pakistani, speaks and understands enough English only to go about minor day-to-day activities. The Defendant was never offered an interpreter, and he was questioned for about three hours. The agents were reluctant to accept Defendant's negative answers to agents' questions implying that the Defendant paid for the marriage to stay in the United States. The agents repeated such questions several time, including possible figures as to how much was paid, and stated that many immigrants, such as the Chinese, pay for such marriages. The Defendant was very tired after finishing a 12-hour shift, and his requests for the agents to repeat questions and to slow down led to visually and audibly frustrated

agents, who spoke in angry tones, which in turn made the Defendant more nervous, as he was unfamiliar with his rights, having never been in such a situation. The Defendant was very tired and simply wanted the agents to leave, but he was unaware that he had the right to have them do so. After questioning, the agent hand-wrote the statement in English, as Defendant's ability to write English is substantially limited. The statement was read back to the Defendant, who was told just to sign the statement, not to worry, and that they would not arrest him.

## ARGUMENTS

### I. Defendant Was in Custody at the Time of Questioning and Was Entitled to Miranda Warnings.

The United State Supreme Court, in Miranda v. Arizona, 384 U.S. 436, 458, held that preinterrogation warnings are required in the context of custodial interrogations given "the compulsion inherent in custodial surroundings." The Court also explained that "custodial interrogation" meant "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id., at 444.

Since Miranda, The Court has further clarified that the concept of custody is not simply limited to situations where police questioning of a defendant follows a formal arrest. In California v. Beheler, 463 U.S. 1121 (1983), the Court stated that "the circumstances of each case must certainly influence" the custody determination, but reemphasized that "the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Id., at 1125. In Berkemer v. McCarty, 468 U.S. 420 (1984), a police officer stopped the Defendant for suspected drunken driving and decided that he was going to arrest the Defendant. However, before doing so, the police officer asked the Defendant some questions, at which point the Defendant admitted to drinking and smoking marijuana. Even though no formal arrest was made prior to the questioning, the Court stated that "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." Id., at 442. In

Stansbury v. California, 511 U. S. 318 (1994), the Court stated that in situations where custody is not clear, courts must examine "all of the circumstances surrounding the interrogation" and determine "how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." *Id.*, at 322. Lastly, in Thompson v. Keohane, 516 U.S. 99 (1995), the Court further attempted to clarify the examination of custody issues by stating that "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Id.*, at 112 (internal quotation marks omitted).

In the case at hand, the Defendant, who works the late shift from 5:00pm to 5:00am, was suddenly awoken by the police knocking loudly on his door. Upon opening the door, three ICE agents, two males and one female, entered his home without asking permission and without informing him of who they were. One agent performed a protective sweep of the home while the two other agents told the Defendant to remain where he stood and not to move. After the protective sweep, the agents told the Defendant to sit down, at which point two agents remained standing while the third began questioning the Defendant regarding his wife and his marriage. One of the agents told the Defendant that it was a felony to not talk to them and that he could be arrested for failure to do so. As the Defendant's primary language is Pakistani, the Defendant often asked the agents to slow down their questioning or to repeat or rephrase their questions. The agents became visibly and audibly frustrated with the Defendant during the questioning. The agents never offered to have a translator present during the questioning. The questioning took approximately three hours. At no point during the questioning did the Defendant feel that he could get up, leave his home, or tell the agents to end the questioning and leave his home.

## II.  Defendant's Statement Was Not Voluntary.

Even if this Court finds that the Defendant was not in custody at the time of the questioning, and therefore not required to receive *Miranda* warnings, his statement was involuntary. The *Miranda* custody inquiry, which is objective in that it looks to what a reasonable person in the defendant's position would believe, is different from the review of the voluntariness of a statement. The Supreme Court, in Lynumn v. Illinois, 372 U. S. 528 (1963) stated that the voluntariness of a statement is often said to depend on whether "the defendant's will was overborne." *Id.*, at 534   The Court later stated that this is a question that logically can depend on "the characteristics of the accused," which can include the suspect's age, education, and intelligence, Schneckloth v. Bustamonte, 412 U. S. 218, 226 (1973).  The Court also included a suspect's prior experience with law enforcement as a characteristic that may be considered in examining the voluntariness of the statement. Lynumn, at 534. Therefore, such an inquiry is inherently subjective, as the characteristics of the Defendant must be examined in determining whether under the circumstances surrounding the statement, the Defendant's will was overcome.

In this case, the Defendant was suddenly awakened by the ICE agents.  The Defendant was unfamiliar with such situations, as he had not been in any prior to this occasion. The presence of three agents entering his home without his permission and conducting a search of the adjoining rooms was startling and intimidating for the Defendant. The Defendant had come to the United States in the year 2000, and has been slowing learning the English language. It was clear to the agents that the Defendant was having trouble understanding their questions, and when the Defendant asked them to repeat or rephrase, the agents became visually and audibly agitated. The agents, in angry tones, accused the Defendant of lying. They told him if he did not answer their questions, he could be arrested. They told the Defendant to sit down while the other two agents stood and the third agent began the questioning. The Defendant was tired from working his 12-hour late shift, and the agents questioned him for

approximately three hours. After denying having paid for the marriage, which was asked of him several times, one of the agents stated that lots of immigrants, such as the Chinese, pay to get into the country. After failing to accept the Defendant's numerous denials, the agents kept asking him how much he paid, and began stating different possible prices. The agents often spoke quickly and angrily. Out of frustration and exhaustion, and after realizing that the agents were not going to leave until they got different answers to the questions, the Defendant finally began agreeing to whatever the agent said. Once the statement was written out by the agent, <u>as the Defendant was unable to write English</u>, he was told by the agent to "Just sign it...don't worry, we're not going to arrest you." The statement was read to the Defendant, by the agent, in English.

It is apparent that, given the circumstances surrounding the statement, as well as the characteristics of the Defendant, the Defendant believed that if he did no talk to and agree with the agents, he would be arrested. He believed that the agents would not leave his home until they got the answers they wanted. The Defendant finally signed the statement written by the agent, after he was told that he would not be arrested.

For the reasons stated above, the statement given by the Defendant should be suppressed, as the Defendant was in custody and denied his *Miranda* warnings, and his statement was not voluntary.

THE DEFENDANT

_____
By His Attorney
Joseph A. Franco, Esq.
51 Park Avenue, Suite 7
West Springfield, MA 01089
Tel: (413) 737-2675
Fax: (413) 747-1721
