UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNTIED STATES OF AMERICA, ) | Criminal No. 05MJ633 |
| ) | |
| v. ) | 05CR30056-MAP |
| ) | |
| ASIF MAHMOOD, ) | |
| Defendant ) | |

### DEFENDANT'S SUPPLEMENTAL SUBMISSION
### ON HIS MOTION TO SUPPRESS STATEMENTS

#### BACKGROUND

On December 1, 2005 a hearing was held before the Honorable Michael A. Ponsor on Defendant's Motion to Suppress Statements on the grounds that his rights pursuant to Miranda v. Arizona, 384 U.S. 436, 475, 86 S.Ct. 1602 (1966) were violated, and also that the statements were not voluntary as a matter of law. Defendant acknowledges that the burden of proof as to the violation of his rights pursuant to the Fifth Amendment and Miranda v. Arizona rests with the government and that the burden of proof as to the voluntariness of the statements rests with the Defendant.

At hearing, the following witnesses were asked to and did testify: Immigration and Customs Enforcement (hereinafter "ICE") Agents Patrick McDonald and Steven Back, as well as Defendant Asif Mahmood. The Defendant would ask this Court to note that lead agent Mary Geha was present in the courtroom but not called by the government in its case in chief or in rebuttal of the Defendant's testimony.

#### FACTS

The facts in this case concentrate on an uninvited entry into the home of the Defendant at 748 Allen Street, Springfield, Massachusetts on October 19, 2005 at approximately 11:25 P.M. Defendant contends that the following facts were elicited at hearing and should be considered in applying the appropriate legal standard in deciding this case.[1]

Special Agent Steven Back was the first to testify. Agent Back testified that he had been an

---

[1] The facts presented are based upon defense counsel's recollection of the Defendant's and agents' testimony, the documentation reviewed and hearing notes kept.

officer with Immigration and Customs Enforcement and its predecessor, the National Immigration Services, since 1997. Prior to that he was employed and trained by the United States Border Patrol. Agent Back states that he was experienced in interviewing techniques and went on to state that he performs interviewing techniques in English and does not change his tactics when the Defendant speaks a different language. Agent Back testified that it took approximately five minutes for the Defendant to answer the door on the date in question. The Defendant had informed them that he was sleeping. Agent Back and Agent McDonald entered the Defendant's home. In his testimony, the Defendant contends that as he opened the door they entered the home. Agent Back states that he asked permission to enter the home. Agent Back further testified that the Defendant was kept in the main living area at all times in sight of an agent while they did a protective sweep of the apartment, looking for the persons, weapons and women's clothing. At all times prior to the initial entry, Agent Mary Geha was initially stationed outside the back door to prevent anyone from fleeing. Once the Defendant was in custody, she entered the house unannounced and without the Defendant's consent and joined in the investigation. Both Agents Back and McDonald testified that the Defendant was informed that giving false statements to a federal agent was a crime. When specifically inquired of by the Court, the agent distinctly stated that the Defendant was never told that he had the right to refuse to speak with them regarding the initial questioning. Defendant's primary language is Urdu, a dialect used in Pakistan. English is the Defendant's second language. The Defendant does not contend that he speaks no English, but only contends that his proficiency in English is much lower than that in his native Urdu, and when he converses in English, it must be done more slowly, words must be explained to him and many times repeated, allowing more time given for understanding.

Except for one year, the Defendant was raised in Pakistan for his entire life until he reached the age of 32. The Defendant did partake in secondary and college education in Pakistan and did study some English. The government has placed before the trier of fact certain training and education transcripts from Mr. Mahmood's prior education experience. The grades that Mr. Mahmood received in his English-related classes were considerably lower than those grades he obtained in those classes in his native language. In fact, the grade he received in English at the University of Punjab was a 39 out of 100. (Defense Exhibit 1). During his examination, Mr. Mahmood stated that he understood most of what the agents said, but not all. He further went on to state that the agents became angered with him when he asked them to slow down, repeat and rephrase their questions. Defendant stated that he felt that he had to comply with the police because they were the police and could not interrupt. Defendant was unaware of his Fifth Amendment rights. He stated that he was very nervous and he believed that he had no choice but to speak with the police. The government inquired whether or not they displayed a gun, the Defendant stated that because they were police he knew to a certainty that they were armed because police always carried guns. The Defendant stated that when he answered the door both Agents Back and McDonald entered his house. He was told to stay in the living room area while the sweep was executed. Shortly after the sweep was concluded he was required to be kept in the living room area which is approximately 12' x 15'. Mr. Mahmood was not allowed to go to the bathroom or to answer the phone. In fact, at one point in time when the telephone did ring, testimony at hearing was that Agent Geha got up and stood in front of the telephone as Defendant attempted to answer it. At that point, although the communication was non-verbal, he understood it to mean that he could not answer the telephone.

The agents stayed at the Defendant's residence for ninety-five minutes. During this ninety-five minute period they continued to coerce him into giving the statement which has been marked at hearing as Government's Exhibit "A". The Defendant's testimony was that he was repeatedly being asked questions and that he was told by the agents that he had to acknowledge the statements. The Defendant, already having been informed that he cannot lie to a federal agent, found himself in the inequitable position of not knowing his right to remain silent, and being forced to answer questions. No attempt was made on the part of any of the ICE agents to bring in an interpreter who would be more familiar with the language of the Defendant and who would be able to explain to Mr. Mahmood to a greater extent what his rights are and exactly what the content of the statement he was given was. The Defendant believed that he was under custody based upon the fact that he was being accused of a crime, he was detained, forced to remain on a chair in the living room, was not allowed to leave that chair and told that it was unlawful for him to give evasive or untruthful answers to a federal officer. The Defendant was the focus of the investigation and the Defendant was told what the penalties were for misleading the federal agents.

During this period of time the Defendant was never told that he did not have to give a statement and that he had rights to make telephone calls or seek a lawyer for his representation. In fact, any chance that the Defendant had to use the telephone was quickly curtailed by Agent Geha moving between the Defendant and the telephone, in effect communicating to the Defendant that the telephone would not be used. The Defendant was sleep deprived, having previously worked a twelve hour shift and was trying to get sleep. The Defendant testified that he was wanting to go back to bed so that he could sleep and possibly go back to work the following evening. After ninety-five minutes, a statement was written by Agent McDonald which the Defendant did not participate in drafting. Agent Back described the Defendant as soft spoken, meek, mild and, to an extent, subservient to their wishes. Only after the statement was completed and the agents had their information did they read the statement to the Defendant. At no time did they allow the Defendant to read the statement himself. At no time did they have the Defendant read a portion of his statement and have him stop to insure that he understood it. In fact, the testimony is that the agents were unaware at what point in time they stopped during the reading of the statement to insure that Mr. Mahmood understood his rights. The testimony before the Court by Agents Back and McDonald was that the statement was read and that Mr. Mahmood was forced to sign it. The reading of the Miranda waivers did not take place line by line. An explanation of each and every right in the Miranda waivers was not given to the Defendant and no offer to have him speak with anyone prior to signing this document or to provide and meet with an attorney was ever given to Mr. Mahmood, a right he would have to waive in order for the statement to be constitutionally firm.

## ARGUMENT

The United State Supreme Court, in Miranda v. Arizona, 384 U.S. 436, 458, held that preinterrogation warnings are required in the context of custodial interrogations given "the compulsion inherent in custodial surroundings." The Court also explained that "custodial interrogation" meant "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id., at 444.

After requiring that a suspect be informed of his right to remain silent and to have an attorney, the Court continued by stating that

> a once-stated warning, delivered by those who will conduct the interrogation, cannot itself suffice to that end among those who most require knowledge of their rights. A mere warning given by the interrogators is not alone sufficient to accomplish that end. Prosecutors themselves claim that the admonishment of the right to remain silent without more 'will benefit only the recidivist and the professional.'

Miranda, 384 U.S. at 469-470; citing Brief for the National District Attorneys Association as amicus curiae, p. 14. The Supreme Court continued by quoting the California Supreme Court:

> 'We must recognize that the imposition of the requirement for the request would discriminate against the defendant who does not know his rights. The defendant who does not ask for counsel is the very defendant who most needs counsel. We cannot punish a defendant who, not understanding his constitutional rights, does not make the formal request and by such failure demonstrates his helplessness. To require the request would be to favor the defendant whose sophistication or status had fortuitously prompted him to make it.'

Miranda, 384 U.S. at 471; citing People v. Dorado, 62 Cal. 2d 338, 351 (1965).

Following Miranda, the Court, in California v. Beheler, 463 U.S. 1121 (1983), stated that "the circumstances of each case must certainly influence" the custody determination, but reemphasized that "the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Id.*, at 1125. In Stansbury v. California, 511 U.S. 318 (1994), the Court stated that in situations where custody is not clear, courts must examine "all of the circumstances surrounding the interrogation" and determine "how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." *Id.*, at 322. Lastly, in Thompson v. Keohane, 516 U.S. 99 (1995), the Court further attempted to clarify the examination of custody issues by stating that "two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Id.*, at 112 (internal quotation marks omitted).

In the case at bar, the Defendant was awakened from sleep to be interrogated by the agents. The agents told him to sit down, and did not let him do anything that would be associated with being free to move. When the phone rang, Agent Geha moved in between the Defendant and the phone, using body language to imply that the Defendant could not answer the phone. The defendant also asked the agents to slow down their questioning or to repeat or rephrase their questions so as to properly understand their questions. The agents became visibly and audibly frustrated with the Defendant during the questioning when he asked them to rephrase or repeat their questions. The

agents never offered to have a translator present during the questioning. The Defendant had not been in a situation where he was being questioned by police, and he was therefore unaware that he had the right to ask the agents to leave. The Defendant also stated that he knew the agents had guns because they were police, and police carry guns. The Defendant made it clear that, given the circumstances, he did not feel free to leave and that he had to answer the agents' questions. The agents waited until the end of the interrogation to read the Defendant his rights, which were printed on the top of the page on which the agent wrote the Defendant's statement. The three agents never left him alone in his home, and they told him to sit in the living room while they asked him questions. The agents told the Defendant that it is a crime to lie to them, and they never informed him that he could refuse to give answers to their questions.

Given the Defendant's lack of proficiency with the English language and his unfamiliarity with our criminal justice system, the act of simply reading his rights to him was of little significance, as he did not understand what was being read to him, and he did not have an attorney present to fully explain to him what his rights were or whether he could exercise them. The act of simply reading the pre-printed rights to the Defendant is what the Miranda decision ruled was not constitutionally sufficient, as such a reading would only be beneficial to a suspect who understood what was being read to him or was familiar with such due to past experiences. Furthermore, the reading of the rights took place after the interrogation and prior to the minuscule act of signing the statement written by the agent. The Court in Miranda made it clear that a simple one-time reading of rights is not sufficient in cases where it is clear that the suspect is unfamiliar with his rights. In this case, the Defendant is an immigrant who has an obvious difficulty with the English language and who has not been in a situation where he would have learned of his rights. The Defendant is neither "a recidivist [n]or a professional." Miranda, 384 U.S. at 470.

Even if this Court finds that the Defendant was not in custody at the time of the questioning, and therefore not required to receive Miranda warnings, his statement was involuntary. The Miranda custody inquiry, which is objective in that it looks to what a reasonable person in the defendant's position would believe, is different from the review of the voluntariness of a statement. The Supreme Court, in Lynumn v. Illinois, 372 U.S. 528 (1963) stated that the voluntariness of a statement is often said to depend on whether "the defendant's will was overborne." Id., at 534  The Court later stated that this is a question that logically can depend on "the characteristics of the accused," which can include the suspect's age, education, and intelligence, Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). The Court also included a suspect's prior experience with law enforcement as a characteristic that may be considered in examining the voluntariness of the statement. Lynumn, at 534. Therefore, such an inquiry is inherently subjective, as the characteristics of the Defendant must be examined in determining whether, under the circumstances surrounding the statement, the Defendant's will was overcome.

In this case, the Defendant was suddenly awakened by the ICE agents. The Defendant was unfamiliar with such situations, as he had not been in any prior to this occasion. The presence of three agents entering his home without his permission and conducting a search of the adjoining rooms was startling and intimidating for the Defendant. The Defendant had come to the United States in the year 2000, and has been slowing learning the English language. It was clear to the agents that the Defendant was having trouble understanding their questions, and when the Defendant asked them to repeat or rephrase, the agents became visually and audibly agitated. The agents, in angry tones,

accused the Defendant of lying. They told him that if he did not answer their questions he could be arrested. They told the Defendant to sit down. Two agents stood and the third agent began the questioning. The Defendant was tired from working his 12-hour late shift, and the agents questioned him for approximately one and a half hours. After denying having paid for the marriage, which was asked of him several times, one of the agents stated that lots of immigrants, such as the Chinese, pay to get into the country. After failing to accept the Defendant's numerous denials, the agents kept asking him how much he paid, and began stating different possible prices. The agents often spoke quickly and angrily. Out of frustration and exhaustion, and after realizing that the agents were not going to leave until they got different answers to the questions, the Defendant finally began agreeing to whatever the agent said. Once the statement was written out by the agent, <u>as the Defendant was limited in his English</u>, he was told by the agent to "Just sign it...don't worry, we're not going to arrest you." The statement was read to the Defendant, by the agent, in English.

It is apparent that, given the circumstances surrounding the statement as well as the characteristics of the Defendant, the Defendant believed that if he did not talk to and agree with the agents he would be arrested. He believed that the agents would not leave his home until they got the answers they wanted. The Defendant finally signed the statement written by the agent after he was told that he would not be arrested.

For the reasons stated above, the statement given by the Defendant should be suppressed, as the Defendant was in custody and denied his *Miranda* warnings, and his statement was not voluntary.

THE DEFENDANT

By His Attorney
Joseph A. Franco, Esq.
51 Park Avenue, Suite 7
West Springfield, MA 01089
Tel: (413) 737-2675
Fax: (413) 747-1721

## CERTIFICATE OF SERVICE

    I hereby certify that I served the foregoing motion on the Government by delivery in hand a copy same, to United States Attorney Kevin O'Regan at 1550 Main Street, Room 310, Springfield, MA, 01103 on December 21, 2005.

                                            Joseph A. Franco, Esq.