UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA      )
                              )
                              )
          v.                  )  05-CR-30056-MAP
                              )
ASIF MAHMOOD,             )
          Defendant       )


MEMORANDUM REGARDING
DEFENDANT'S MOTION TO SUPPRESS
(Docket No. 15)

February 3, 2006

PONSOR, D.J.

## I. INTRODUCTION

Defendant, Asif Mahmood, has been charged in a one-count indictment with engaging in marriage fraud to evade the immigration laws.  On October 6, 2005, he moved to suppress oral and written statements he made to Immigration and Customs Enforcement ("ICE") agents investigating the alleged offense, on the ground that his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), were violated.

On December 1, 2005, the court heard testimony bearing on the motion from three witnesses.  After considering this evidence, in addition to supplemental memoranda filed by the Government and Defendant, the court allowed the motion in an order dated January 26, 2006.  This memorandum will set forth the reasons supporting that ruling.

## II. <u>FINDINGS</u>

The facts, based upon the credible evidence presented at the hearing, are as follows.[1]  On the morning of April 19, 2005, Special Agents Stephen Back, Patrick McDonald, and Mary Geha arrived at Defendant's residence at 748 Alden Street in Springfield, Massachusetts for the purpose of investigating a report of suspicious immigration-related activity.  Specifically, a woman purporting to be Defendant's ex-girlfriend had informed the FBI that Defendant, a recent immigrant from Pakistan, had offered her money to marry him.  Defendant, in an application to change his immigration status, had represented himself to be married, and the agents wanted to know whether this marriage, to a woman named Miriam Santos, was legitimate.

Upon their arrival at the Alden Street residence, Agents Back and McDonald went to the front door.  The agents had deliberately refrained from contacting Defendant by phone before their arrival.  Mindful that illegal aliens often flee at the sight of law enforcement officials, Agent Geha secured the back.  All three agents were armed but did not brandish their weapons.

At approximately 11:25 a.m., Agent Back began knocking

---

[1] No transcript has yet been prepared of the hearing. These findings are based on the court's detailed notes.

loudly on Defendant's front door.  After two or three
minutes, Defendant, who normally worked evening hours and
had been sleeping,[2] opened the door.

After asking Defendant to identify himself, Agents Back
and McDonald displayed their badges and asked if they could
come in.  When Defendant offered no objection, the two
agents entered the residence and, without asking Defendant's
permission, conducted a "protective sweep" of the premises.
The agents ordered Defendant to remain in the living room
during the sweep, within view at all times of at least one
agent.

Satisfied that Defendant was alone, Agent Back returned
to the living room and proceeded to ask Defendant a series

---

[2] Three weeks after the suppression hearing, the Government
submitted an affidavit from Lenox/American Saw employee,
Cleveland Burton, stating that Defendant "was not scheduled to
work and in fact did not work on the overnight shift from 5:00
pm on 4/18/05 to 5:00 am on 4/19/05."  (Dkt. No. 21, Govt's
Supplemental Mem. Opp'n Mot. Suppress, Ex. 1, at 2.)  According
to the Government, "[t]his fact is relevant because [Defendant]
falsely told the agents that he had been sleeping after he had
worked the previous evening at American Saw."  (Govt's
Supplemental Mem. Opp'n Mot. Suppress 2-3.)

It is not necessary to address Defendant's request for an
opportunity to cross-examine Burton, because his affidavit adds
little to the government's case.  Agent Back's testimony
concerning the time it took Defendant to answer his door
corroborated Defendant's testimony that he had been asleep.
Whether Defendant was asleep because he had just worked an
overnight shift or because he was preparing to work an
overnight shift is insignificant in the context of this case.

In sum, the persuasive evidence confirmed that Defendant
was asleep when the agents knocked.  Why Defendant was asleep
is irrelevant.

of questions.  Agent Back did not inform Defendant that he
was free to decline to provide any answers.  Nor did he
advise Defendant that he could terminate the interrogation
at his discretion.

Despite Defendant's obvious foreign accent, the agents
did not ask Defendant if he would prefer to speak with them
via an interpreter.  In fact, as Defendant credibly
testified at the hearing, his grasp of the language was
tentative, and he often did not understand the questions put
to him.[3]  Whenever Defendant requested that agents slow down
or repeat themselves, they became visibly annoyed and harsh
in their tone.  Having never encountered law enforcement
officials from this country, Defendant was unaware that he
had the right to remain silent, to seek the advice of an
attorney, or to ask the agents to leave.

At the onset of the interrogation, Agent Back asked

_____

[3] According to the government, the Burton affidavit "makes
it clear that [Defendant] reads, writes and speaks English
well."  (Govt's Supplemental Mem. Opp'n Mot. Suppress 2.)
    Again, putting aside Defendant's right to cross-examine
this witness, the only thing the Burton affidavit makes clear
is   that   Defendant   possesses   certain   English   language
communication skills within his technical field.  (See id.
("[Defendant" spoke with Mr. Burton [in English] on numerous
occasions relating to [Defendant's] job at American Saw.   In
particular, [Defendant] was trained on specialized protocols
and procedures related to his job as a robotics operator.").)
The affidavit fails to establish that Defendant would have been
adept   at   communicating   in   English   during   this   unexpected
encounter with federal agents.

Defendant if his wife lived with him.  When Defendant replied that she did, Agent Back inquired as to the whereabouts of her clothes.  Defendant paused, then said that they might be at the cleaners.  In response, Agent Back stated that he did not believe Defendant was telling the truth.

At this point, the two agents and Defendant sat down in the 12' x 15' room with Agent Back choosing a seat close enough to Defendant to permit him periodically to place his hand on Defendant's shoulder to, as he termed it, "put him at ease."

Agent Back stressed the importance of telling the truth to federal agents by informing Defendant that it was a crime not to do so.  The agents did not specifically state that Defendant was under arrest or that they intended to arrest him.  Nevertheless, Defendant reasonably concluded that he was not free to leave or to ask the agents to leave.  Shortly thereafter, Agent Gehu entered the residence unannounced and, without Defendant's consent, began participating in the interrogation.

As the questioning continued, Defendant's telephone began to ring.  This did not prompt the agents to suggest that they take a break, and they gave no indication that it would be permissible for Defendant to answer the telephone.

-5-

On the contrary, when Defendant turned to approach the phone, Agent Gehu stood up and placed herself in front of it.  Interpreting this behavior as a prohibition, Defendant abandoned his effort to reach the phone.

After more than an hour of questioning, Defendant stated that Miriam Santos did not live with him at the Alden Street residence and that he had paid her to marry him.  When Defendant agreed to provide a written statement to that effect, Agent McDonald drafted the statement and read it to Defendant.  Agent McDonald did not provide Defendant with a copy to follow as he read the statement to him.  Before Defendant signed the statement, the agents read him the pre-printed Miranda warnings that appeared in English on the form.

In the course of the ninety-five minute interrogation, the agents did not ask Defendant if he cared to use the bathroom, and Defendant did not feel he was entitled to do so.  Defendant was anxious and concluded that he was obliged to be compliant.  Indeed, Agent Back described Defendant as meek, mild, and very soft-spoken.

### III. DISCUSSION

Defendant asserts that any statements he made during the April 19, 2005 interrogation should be suppressed because ICE agents did not advise him of his rights pursuant to

Miranda.  In response, the Government argues that Miranda
warnings were not required since Defendant was not in
custody when the statements in question were made.

The Fifth Amendment provides all persons with the
privilege against compelled self-incrimination.  To
safeguard this right, courts have consistently held that
"Miranda warnings must be given before a suspect is
subjected to custodial interrogation."  United States v.
Ventura, 85 F.3d 708, 710 (1st Cir. 1996) (citing United
States v. Taylor, 985 F.2d 3, 7 (1st Cir. 1993); see also
Berkemer v. McCarty, 468 U.S. 420, 429 (1984) (stating that
when law enforcement officials "take a suspect into custody
and then ask him questions without informing him of [his
rights pursuant to Miranda], his responses cannot be
introduced into evidence to establish his guilt").

In Miranda, the Court defined "custodial interrogation"
as "questioning initiated by law enforcement officers after
a person has been taken into custody or otherwise deprived
of his freedom of action in any significant way."  384 U.S.
at 444.  Subsequent Courts have held that "custody must be
determined based on how a reasonable person in the suspect's
situation would perceive his circumstances."  Yarborough v.
Alvarado, 541 U.S. 652, 662 (2004) (citing Berkemer, 468
U.S. at 442; see also Stansbury v. California, 511 U.S. 318,

-7-

323 (1994) ("[T]he initial determination of custody depends on the objective circumstances of the interrogation . . . .").

Ultimately, the question is whether there was a "'restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (citing Oregon v. Mathiason, 429 U.S. 492, 495 (1977)).  In making this determination, a court may consider numerous, case-specific factors, including "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." United States v. Nishnianidze, 342 F.3d 6, 13 (1st Cir. 2003), cert. denied, 540 U.S. 1132 (2004) (quoting United States v. Masse, 816 F.2d 805, 809 (1st Cir. 1987)); see also Ventura, 85 F.3d at 711 n.3 (noting that the relevant factors enumerated in Masse are "not an exhaustive list").

Although "determining what constitutes custody can be a 'slippery' task," Ventura, 85 F.3d at 711 (citing Oregon v. Elstad, 470 U.S. 298, 309 (1985)), this case does not present a close call.  On the contrary, it is quite clear

that ICE agents interrogated[4] Defendant while restraining his freedom of movement to a degree consistent with a formal arrest.

First, although the interview took place in Defendant's home, "a deprivation of freedom can as readily take place [there] as at a police station." United States v. Goodridge, 945 F. Supp. 359, 365 (D. Mass. 1996) (citing Orozco v. Texas, 394 U.S. 324 (1969)).  Here, Defendant was by himself when the agents arrived and remained isolated during the duration of the encounter.  Cf. United States v. Lanni, 951 F.2d 440, 442 (1st Cir. 1991) (fact that interview was conducted "in defendant's home, with her husband, child, and pets nearby" suggested defendant was not restrained).  More importantly, any reassurance Defendant may have drawn from familiar surroundings quickly dissipated once Agents Back and McDonald entered and immediately asserted dominion.  See Sprosty v. Buchler, 79 F.3d 635, 641 (7th Cir. 1996), cert. denied, 519 U.S. 854 (1996), cited with approval in Ventura, 85 F.3d at 711 n.3 (noting the significance of "the degree of police control over the

_____

[4] "For Miranda purposes, interrogation is 'express questioning or its functional equivalent.'" United States v. Genao, 281 F.3d 305, 310 (1st Cir. 2002), cert. denied, 537 U.S. 901 (2002) (citing Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980)).  It is essentially undisputed that Defendant made the challenged statements in the course of an ICE interrogation.

environment in which the interrogation takes place"). The
agents' sweep of the premises, combined with Agent Gehu's
later entrance, all outside Defendant's control, would have
convinced any reasonable person in Defendant's position that
the agents had taken charge of the apartment.

Second, the number of law enforcement officers present
at the scene is another factor "in favor of suppression."
Nishnianidze, 342 F.3d at 13-14.  Like the suspect in
Nishnianidze, Defendant endured questioning "administered by
three agents in a small area." Id. at 14; cf. Mathiason,
429 U.S. at 493 ("The officer met defendant in the hallway,
shook hands and took him into an office. . . .  The door was
closed.  The two sat across a desk.").

Third, while ICE agents did not physically restrain
Defendant, Agent Gehu blocked his access to the telephone,
and Agents Back and McDonald required him to remain within
view during the search of the premises. See Lanni, 951 F.2d
at 443 (distinguishing United States v. Griffin, 922 F.2d
1343, 1354 (8th Cir.1990), a case compelling suppression
because the defendant "was told to remain in view of the
agents at all times").

Finally, the restraint on Defendant's freedom and
accompanying interrogation was significant in length, and
the environment was inherently coercive.  This conclusion

-10-

becomes all the more apparent when one contrasts the facts
of this case to those found in the most recent Supreme Court
case to consider the question of custody.

In <u>Yarborough</u>, the Court found that the following facts
weighed against a custody finding: (1) the suspect felt
neither threatened nor coerced, but characterized the
interview as a "pretty friendly conversation" with a "free
flow" between him and the questioning officer, 541 U.S. at
658; (2) the officer offered the suspect two breaks, <u>id.</u>;
and (3) the focus of the interview was not the suspect's but
an acquaintance's crimes, <u>id.</u> at 664.

In contrast, Defendant testified credibly that the three
ICE agents became impatient with him and used a harsh tone
whenever he asked them to slow down or repeat themselves.
The atmosphere was far from "friendly." Moreover, the agents
did not offer Defendant a single break, even when his phone
began to ring.  In addition, their questions were
accusatory, focused exclusively on Defendant's alleged
criminal activity.  See <u>Stansbury</u>, 511 U.S. at 325 ("An
officer's knowledge or beliefs may bear upon the custody
issue if they are conveyed, by word or deed, to the
individual being questioned.").

Finally, like the officer in <u>Yarborough</u>, the ICE agents

-11-

never informed Defendant that he was free to leave[5] or that
he had the right to "refrain from answering questions."
Sprosty, 79 F.3d at 641; cf. United States v. Coker, 298 F.
Supp. 2d 184, 188 (D. Mass. 2003), aff'd, 433 F.3d 39 (1st
Cir. 2005) (finding that a setting was non-custodial due, in
part, to the fact that the "agents told [the suspect] that
he was free to refuse to answer questions and could leave at
any time").

In the alternative, the evidence demonstrates that
Defendant's statements "were made without an intelligent,
knowing, and voluntary waiver of his Fifth Amendment
rights."  United States v. Garcia, 983 F.2d 1160, 1169 (1st
Cir. 1993); see also United States v. Bezanson-Perkins, 390
F.3d 34, 39 (1st Cir. 2004) (quoting Moran v. Burbine, 475
U.S. 412, 421 (1986)) (explaining that a statement is
"knowing and intelligent when 'made with a full awareness of
both the nature of the right being abandoned and the
consequences of the decision to abandon it'").

To determine whether a statement was voluntary a court
"must examine the 'totality of circumstances surrounding the
interrogation,'" United States v. Ferrer-Cruz, 899 F.2d 135,
141 (1st Cir. 1990) (citation omitted), as well as "the

_____

[5] Cf. Thompson v. Keohane, 516 U.S. 99, 103 (1995) (noting
that the two unarmed troopers who conducted the interview
"constantly assured [Defendant] he was free to leave").

background, experience, and conduct of the accused," <u>Garcia</u>, 983 F.2d at 1169 (citations omitted). <u>See also</u> <u>United States v. Palmer</u>, 203 F.3d 55, 62 (1st Cir. 2000), <u>cert. denied</u>, 530 U.S. 1281 (2000) (noting that it is the government's burden to prove voluntariness by a preponderance of the evidence).

As previously discussed in detail, this case "contain[s] a substantial element of coercive [government] conduct." <u>Colorado v. Connelly</u>, 479 U.S. 157, 164 (1986). Accordingly, the question becomes whether Defendant had the capacity to endure the "coercive official tactics" employed by ICE agents. <u>See</u> <u>United States v. Byram</u>, 145 F.3d 405, 407 (1st Cir. 1998) (citing <u>Connelly</u>, 479 U.S. at 167) (finding such tactics a necessary predicate to an involuntary confession).

One persuasive argument that he lacked this capacity stems from Defendant's difficulty communicating in English. In examining this aspect of Defendant's background, it is helpful to contrast the totality of his circumstances with those recently found by the First Circuit in another case involving a potential language barrier.

In <u>United States v. Luciano</u>, 329 F.3d 1 (1st Cir. 2003), the court encountered the closely analogous issue of whether a suspect voluntarily consented to a warrantless search.

-13-

Like Defendant, the suspect in <u>Luciano</u> sought to undermine
the effect of his signature on a statement prepared by the
government by claiming difficulties with the English
language.  <u>Id.</u> at 7.  However, unlike Defendant, the <u>Luciano</u>
suspect: (1) had "spent twelve of his thirty years
-- including third through eighth grades -- in the United
States"; (2) offered patently incredible testimony that he
did not understand English at all; and (3) signed the
statement in question after federal agents "Mirandized" him
twice -- "both times in English and Spanish."  <u>Id.</u>

    In contrast, <u>United States v. Gallego-Zapata</u>, 630 F.
Supp. 665 (D. Mass. 1986) involved a suspect with a
background quite similar to Defendant's.  In that case, the
district court found that the defendant had difficulty
understanding English, "had only recently arrived in the
United States and so probably lacked familiarity with his
[constitutional] rights" and "merely submitted to what must
have appeared . . . a 'claim of lawful authority.'"  <u>Id.</u> at
675 (citing <u>Florida v. Royer</u>, 460 U.S. 491, 497 (1983))
(concluding that the defendant did not consent voluntarily
to the search in question).

    Complicating Defendant's language difficulty was his
utter inexperience with the legal system.  Like the accused
in <u>Lynumn v. Illinois</u>, 372 U.S. 528 (1963), who "had had no

-14-

previous experience with the criminal law," id. at 534,
Defendant had never before encountered state or federal law
enforcement officials.  Accordingly, he was susceptible to
the kind of psychological coercion that can render a
statement involuntary.  Cf. United States v. Jackson, 918
F.2d 236, 242 (1st Cir. 1990) (finding no evidence that the
accused "was unusually susceptible to psychological coercion
. . . particularly in light of [his] very substantial
previous experience with the criminal justice system").

Finally, a court must consider the conduct of the
accused.  In this case, Defendant testified credibly that he
felt obligated to follow the agents' orders and comply with
their requests.  Defendant did not raise any questions when
Agents Back and MacDonald conducted the protective sweep or
when Agent Geha entered his apartment without obtaining his
permission.  Nor did Defendant attempt to answer his phone
when Agent Geha blocked his access to it.  Despite the fact
that he had been sleeping prior to the agents' arrival,
Defendant did not ask to use the bathroom or take a break.
In the words of Agent Back, Defendant was, at all times,
meek, mild, and very soft-spoken.

In sum, the failure of the agents to provide Defendant
with a Miranda warning before conducting the interrogation
renders Defendant's statements in these circumstances

-15-

inadmissible.   Moreover, given the totality of these
circumstances, the court must conclude that the statements,
both written and oral, were not knowingly and intelligently
made and that Defendant's will was overborne by federal
agents, making the challenged statements involuntary as a
matter of law.   See Lynumn, 372 U.S. at 534.

### IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to
Suppress was ALLOWED on January 26, 2006.   Counsel will
appear for a status conference on February 13, 2006, at 2
p.m.

/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U. S. District Judge